[PUBLISH]

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 23-12847

_____

In re: RAJESH C. PATEL,

Debtor.

_____

RAJESH C. PATEL,

Plaintiff-Appellant,

*versus*

RISHI M. PATEL,
MUKESH C. MIKE PATEL,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:22-cv-02651-SCJ,
Bkcy No. 1:16-bk-65074-LRC

————————————

Before WILLIAM PRYOR, Chief Judge, and GRANT and KIDD, Circuit Judges.

WILLIAM PRYOR, Chief Judge:

This appeal requires us to decide whether a bankruptcy court has the authority to annul—or retroactively grant relief from—the automatic stay in the wake of the decision in *Roman Catholic Archdiocese of San Juan v. Acevedo Feliciano*, 140 S. Ct. 696 (2020). Rajesh Patel's petition for bankruptcy in 2016 triggered the automatic stay of all creditor actions against him. A few months later, despite the stay, Patel willingly participated in an arbitration proceeding. After he lost and a state court affirmed the arbitration award, Patel moved the bankruptcy court to stay enforcement of the award. Sensing gamesmanship, the bankruptcy court instead exercised its authority to annul the stay "for cause." 11 U.S.C. § 362(d)(1). Patel challenges the annulment as contrary to *Acevedo*. There, the Supreme Court held that a district court could not enter a *nunc pro tunc* judgment to validate orders that a Puerto Rico trial court entered after the case was removed to federal court. *Acevedo*, 140 S. Ct. at 700–01. Because *Acevedo* concerns the removal jurisdiction of a district court and does not affect the statutory authority

of a bankruptcy court to annul the automatic stay for cause, we affirm.

## I. BACKGROUND

Rajesh "R.C." Patel and Mukesh "Mike" Patel are brothers. Both immigrated to Pell City, Alabama, within a few years of each other—R.C. in 1981 and Mukesh in 1979—to work in the family hotel business. Over the next few decades, the brothers expanded the family business into a conglomerate worth $250 million. They bought and sold "over 140 to 150 hotels," added commercial properties to their real-estate portfolio, opened an insurance company, and even founded a bank. Then 2008 came, and with it, the Great Recession. In a matter of months, the brothers watched years of work "meltdown."

The brothers' relationship collapsed with their businesses. Judgments piled up against them. At some point, R.C. transferred many assets to his wife, Shama. The brothers' families have since then been locked in litigation, with R.C., Shama, and their children—called the "Shama Party," on one side, and Mike, his wife Hasmita (now deceased), and their children—called the "Hasmita Party," on the other.

In August 2016, R.C. filed a voluntary petition for bankruptcy. The petition triggered the automatic stay, which enjoined all collection efforts, lawsuits, and foreclosure actions against him as the debtor. 11 U.S.C. § 362(a). And the bankruptcy court appointed a trustee over R.C.'s estate. Weeks later, one of R.C.'s sons,

Jay Patel, filed a civil action in state court against a member of the Hasmita Party. Jay later agreed to arbitrate the claim.

R.C. and his attorney, Buddy Parker, participated in the arbitration without ever suggesting that the automatic stay affected the proceeding. R.C. attended the arbitration hearing, passed out binders of documents, and gave an opening statement. He pursued his own claims against the Hasmita Party—including claims for $220,000 against the Hasmita Party (which he did *not* disclose in his bankruptcy schedules) and one claim for $600,000 against Mike (which he listed as a claim for an "unknown" amount in the schedules). At the close of the arbitration, Parker submitted proposed findings of fact that omitted any mention of the automatic stay. He remained mute about the stay when he later met with the arbitrator to discuss final issues. And he did not file "anything in [the] bankruptcy court to stop the arbitration."

Later, Parker admitted that he and R.C. intentionally downplayed the bankruptcy during the arbitration. Parker knew about the automatic stay. Indeed, he believed that R.C.'s bankruptcy should have stayed the entire arbitration and that "an arbitration award could not be issued and collected" against R.C. But Parker and R.C. made the strategic choice not to assert that the stay barred the proceeding. They instead saved it as a "poison pill" to deploy if the arbitration went against them. So when the arbitrator asked about the effect of R.C.'s bankruptcy on the proceedings, R.C. did not object when a lawyer for the Hasmita Party presented research that concluded that the bankruptcy stay operated on R.C. but not

on the other members of the Shama Party. And after communicating with Parker, another lawyer for the Hasmita Party believed that the Hasmita Party "w[as] not going to pursue any affirmative claims against [R.C.]."

After the arbitrator entered an award in favor of the Hasmita Party, R.C. sought to deploy his poison pill. At a meeting with the Hasmita Party, Parker threatened to seek sanctions unless they agreed that the arbitration was void in its entirety because of the bankruptcy stay. Then, when the Hasmita Party asked the arbitrator to amend the award to specify that "none of the monetary damages ordered against the [Shama Party] applie[d] to [R.C.]," he objected to the amendment on the ground that the 30-day deadline to amend the award had expired.

R.C. then tried a different tack to void the arbitration award: he filed a petition to vacate in a state court and argued that the award was a "flagrant violation of the automatic stay." The Hasmita Party asked the state court to affirm the award "subject to the limitation that no relief [would be] sought against [R.C.]." The state court ruled for the Hasmita Party and affirmed the award.

Out of other options, R.C. finally turned to the bankruptcy court for relief. He moved the bankruptcy court to stay the enforcement of the arbitration award against the other members of the Shama Party because his "family members[']" assets "were essentially [his] assets." The Hasmita Party, in turn, moved for summary judgment on the grounds that the *Rooker-Feldman* doctrine and res judicata barred the court from deciding whether the state court's

confirmation of the award violated the automatic stay. The bankruptcy court denied the Hasmita Party's motion for summary judgment. It then ordered the parties to resolve discovery issues and to prepare for an evidentiary hearing.

In the briefing before the evidentiary hearing, R.C. stated that he sought an award of damages, including punitive damages, because the Hasmita Party acted "intentional[ly] and flagrant[ly]." The Hasmita Party asked the bankruptcy court to annul the stay. R.C. reserved the right to file a responsive brief "regarding annulling the [s]tay," but he did not object to consideration of annulment. Only after the evidentiary hearing did R.C. object to the Hasmita Party's request. He asserted that a recent Supreme Court decision, *Acevedo*, prevented the bankruptcy court from annulling the stay. He also argued that the Hasmita Party failed to follow the procedural protocol "necessary" to request relief.

The bankruptcy court granted the Hasmita Party's request to annul the stay. It ruled that the Bankruptcy Code gave it statutory authority to grant relief "by terminating, annulling, modifying, or conditioning" the stay "for cause." 11 U.S.C. § 362(d)(1). Although the court agreed that entry of the arbitration award violated the stay because it "purported to assess personal liability against [R.C.]," it found that R.C., "rather than the [Hasmita Party], was responsible for [that] violation." R.C.'s conduct, it determined, "weigh[ed] heavily in favor of annulling the stay" because he "embarked on a calculated attempt to use the automatic stay to protect his family, usurp the Trustee's ability to liquidate property of the

estate, and gain an unfair advantage against the [Hasmita Party]." That is, he "proceeded with the hope that, if he and the [Shama Party] were successful, his family would benefit and he could keep the proceeds of his prepetition claims without using them to pay his creditors, and if not, he could run to this Court and cry foul to void the entire award."

The bankruptcy court also rebuffed both of R.C.'s objections. As for *Acevedo*, it concluded that the decision did not "pertain[] to [its] power to annul the automatic stay." As for the procedural protocol, the bankruptcy court rejected R.C.'s "argument that [it] should deny the request to annul the stay because the [Hasmita Party] did not file a separate motion." The Hasmita Party, it found, "made several requests for this relief," R.C. had "been on notice of what" the Hasmita Party sought "for quite some time," and the court "held a hearing at which [R.C.] had sufficient opportunity to oppose the requested relief." In short, R.C. "in no way" suffered "prejudice[]" from the Hasmita Party's "failure to file a separate motion."

R.C. appealed to the district court. His argument elaborated on *Acevedo*, where the Supreme Court held that a Puerto Rico trial court lost jurisdiction to issue orders in an action that had been removed to federal court and was awaiting remand. 140 S. Ct. at 700–01. The Court concluded that the federal court's *nunc pro tunc* order, which backdated to March 2018 its remand decision in August 2018, could not retroactively validate the orders issued by the Puerto Rico court while the case was removed. *Id.* R.C. asserted

that the annulment of the stay amounted to an impermissible *"nunc pro tunc* order . . . [that] retroactively grant[ed] jurisdiction to a state court's judgment previously rendered void" by the automatic stay. After *Acevedo*, R.C. contended, "annulment of the stay [was] necessarily 'revisionist history'" that "retroactively [gave] jurisdiction to actions that previously had none."

The district court recognized that "persuasive authority" split on bankruptcy courts' power to annul automatic stays after *Acevedo*. One decision, *In re Telles*, supported R.C.'s position. No. 8-20-70325, 2020 WL 2121254, at \*5 (Bankr. E.D.N.Y. Apr. 30, 2020). There, the bankruptcy court ruled that *Acevedo* abrogated its power to annul the automatic stay in a similar context. *Id.* at \*4–5. It reasoned that after the "debtor files for bankruptcy, the state court is divested of jurisdiction over property of the estate, and any action taken by the state court with respect to the debtor's property is void." *Id.* at \*4. "[P]ost-*Acevedo*," the bankruptcy court concluded, *"nunc pro tunc* relief cannot be used to confer jurisdiction where none existed." *Id.* But another decision, *In re Merriman*, rejected *Telles* and reached the opposite conclusion. 616 B.R. 381, 391, 393–94 (B.A.P. 9th Cir. 2020). It did not "interpret *Acevedo* as pertaining to the bankruptcy court's power to annul the automatic stay under [section] 362(d)." *Id.* at 393.

In the end, the district court affirmed the order and rejected R.C.'s argument that, under *Acevedo*, the annulment constituted an "impermissible *nunc pro tunc* order." It instead ruled, like almost every other court to consider the issue, that the bankruptcy court

possessed statutory authority under section 362(d) to annul the stay. *E.g.*, *Merriman*, 616 B.R. at 391–95; *In re Okorie*, No. 19-50379, 2024 WL 559083, at ⋆7 (Bankr. S.D. Miss. Feb. 12, 2024) (holding that *Acevedo* was "inapposite" because the "Bankruptcy Code expressly authorizes annulment as one form of relief from the stay"); *In re Khan*, No. 20-60032, 2021 WL 4865278, at ⋆5 (S.D. Fla. Oct. 19, 2021) (concluding that *Acevedo* did not control in a similar case because "the text of the Bankruptcy Code itself gives Bankruptcy Judges the power not only to 'terminate' but also to 'annul' the automatic stay" (quoting 11 U.S.C. § 362(d))); *In re Dellinger*, No. 20-41208, 2021 WL 4465583, at ⋆2 n.5 (Bankr. N.D. Ala. Sept. 29, 2021) (citing *Merriman* for the proposition that *Acevedo* does not prevent retroactive annulment of the automatic stay); *In re Parker*, 624 B.R. 222, 236 n.11 (Bankr. W.D. Pa. 2021) (same).

## II. STANDARDS OF REVIEW

Three standards govern our review of a judgment affirming an order of a bankruptcy court. *See Lee v. U.S. Bank Nat'l Ass'n*, 102 F.4th 1177, 1181 (11th Cir. 2024). First, we review the bankruptcy court's findings of fact for clear error. *Id.* at 1182. Second, we review its legal conclusions *de novo*. *Id.* at 1181–82. Third, we review its decision to annul the automatic stay for abuse of discretion. *In re Dixie Broad., Inc.*, 871 F.2d 1023, 1026 (11th Cir. 1989).

## III. DISCUSSION

When a debtor petitions for bankruptcy, an estate is created. 11 U.S.C. § 541(a). That estate consists of all the debtor's property, *id.*, and the bankruptcy court obtains exclusive jurisdiction over the

estate, 28 U.S.C. § 1334(e)(1) (providing that the district court has exclusive jurisdiction "of all the property, wherever located, of the debtor as of the commencement of [the] case, and of property of the estate"); *id.* § 157(a) (authorizing district courts to refer bankruptcy-related cases to the bankruptcy court). This jurisdiction permits the bankruptcy court "to 'determine all claims that anyone, whether named in the action or not, has to the property or thing in question.'" *Tenn. Student Assistance Corp. v. Hood*, 541 U.S. 440, 448 (2004) (alteration adopted) (quoting 16 J. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 108.70[1], at 108–106 (3d ed. 2004)).

The filing of the bankruptcy petition also triggers an automatic stay to shield the estate from collateral litigation. 11 U.S.C. § 362(a). This stay "is one of the fundamental debtor protections provided by the bankruptcy laws." *In re Patterson*, 967 F.2d 505, 512 n.9 (11th Cir. 1992). It provides "breathing room" for the debtor by halting all collection and foreclosure actions. *Auriga Polymers Inc. v. PMCM2, LLC*, 40 F.4th 1273, 1277–78 (11th Cir. 2022). To that end, the automatic stay halts judicial, administrative, and other actions or proceedings, including arbitrations, against the debtor. 11 U.S.C. § 362(a)(1)–(8); *Ritzen Grp., Inc. v. Jackson Masonry, LLC*, 140 S. Ct. 582, 591 (2020) ("Bankruptcy's embracive automatic stay stops even nonjudicial efforts to obtain or control the debtor's assets."). It stops creditors' prepetition proceedings against a debtor, arbiters' entry of an award against the debtor, and collectors' attempts to satisfy a prepetition debt. 11 U.S.C. § 362(a)(1)–(8). And typically, "actions taken in violation of the automatic stay are void and without effect." *United States v. White*, 466 F.3d 1241, 1244 (11th Cir.

2006) (alteration adopted) (citation and internal quotation marks omitted).

The automatic stay can be modified "for cause." 11 U.S.C. § 362(d)(1). Consistent with the "policies of flexibility and equity built into Chapter 11 of the Bankruptcy Code," *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 525 (1984), section 362(d) gives bankruptcy courts the power to "grant relief from the stay . . . by terminating, annulling, modifying, or conditioning [the] stay." Importantly, annulments "grant retroactive relief from the automatic stay," "so as to validate action taken during the pendency of the stay." *In re Albany Partners, Ltd.*, 749 F.2d 670, 675 (11th Cir. 1984) (citation and internal quotation marks omitted).

*Acevedo* did not address the authority to annul automatic stays. In *Acevedo*, the Supreme Court reviewed the March 2018 orders of a Puerto Rico trial court that were issued "after the proceeding was removed to federal district court, but before the federal court remanded the proceeding." 140 S. Ct. at 700. Typically, such orders are void because, after removal, the state court "loses all jurisdiction over the case" and any later actions, taken before a remand, are "void." *Id.* (alteration adopted) (citation and internal quotation marks omitted). The district court, in a procedural sleight of hand, attempted retroactively to validate the March 2018 orders of the Puerto Rico trial court when it later remanded the suit in August 2018. *Id.* It entered a *nunc pro tunc* order—i.e., a "now for then" order—that provided that the remand was effective as of March 2018. *Id.* (citation and internal quotation marks omitted).

The Supreme Court rebuffed this jurisdictional workaround. It held that the *nunc pro tunc* order could not retroactively confer jurisdiction on the Puerto Rico trial court and validate the March 2018 orders. *Id.* at 701.

*Acevedo* turned on the meaning of a statute that regulates the jurisdiction of a district court. Under that statute, 28 U.S.C. § 1446(d), after a defendant files a notice of removal, the state court "loses all jurisdiction over the case, and, being without jurisdiction, its subsequent proceedings and judgment are . . . absolutely void." *Acevedo*, 140 S. Ct. at 700 (alterations adopted) (citation and internal quotation marks omitted). The Supreme Court held that a district court cannot countermand that statutory loss of state jurisdiction by retroactively conferring it. *Id.* at 701.

This appeal, in contrast, concerns section 362(d) of the Bankruptcy Code, which grants bankruptcy courts the power to modify or annul a stay and permit another court or entity to exercise control over an asset or claim. The phrasing of section 362(d) underscores the broad and flexible power of bankruptcy courts to grant relief. Congress used four verbs—"terminating, annulling, modifying, [and] conditioning"—to describe the bankruptcy court's authority to alter automatic stays. 11 U.S.C. § 362(d). Section 1446, on the other hand, grants district courts no such power in actions removed from state court.

R.C.'s contrary arguments reflect a misunderstanding of jurisdiction. He argues that the bankruptcy court's decision to annul the stay "retroactively" gave "jurisdiction to actions that previously

had none," which turned the annulment into "'revisionist history' of the sort the Supreme Court . . . ruled improper" in *Acevedo*. But the jurisdictional concerns that underscored *Acevedo* play no role here. True, the state court order was void to the extent that it purported to hold R.C. accountable for the award. But it was not void for want of jurisdiction over the suit like the Puerto Rico court orders in *Acevedo*. After all, state and federal courts have concurrent jurisdiction over civil proceedings "related to" cases brought under Chapter 11 of the Bankruptcy Code. *See* 28 U.S.C. § 1334(b). The annulment did not retroactively grant jurisdiction where there was none; it eliminated "an impediment to the . . . enforcement" of the arbitration award against assets in the bankruptcy estate and under the bankruptcy court's control. *Merriman*, 616 B.R. at 394.

R.C. conflates *nunc pro tunc* orders with annulments. He contends that the bankruptcy court used an "impermissible" *nunc pro tunc* order "to reinstate state court power" and "provide . . . jurisdiction." This order, he contends, ignored *Acevedo*'s instruction that district courts cannot use *nunc pro tunc* orders to "make the record what it is not" and supply jurisdiction where none existed.

R.C. misses that *nunc pro tunc* orders and annulments are different judicial tools. Annulment, on the one hand, is a statutory power granted to bankruptcy courts by Congress, which allows them to "grant retroactive relief from the automatic stay" and "validate action taken" while the stay was in effect. *Albany Partners*, 749 F.2d at 675 (citation and internal quotation marks omitted). *Nunc pro tunc* orders, on the other hand, stem from the inherent judicial

power to "correct mistakes or omissions in the record so that the record properly reflects the events that *actually took place.*" *Rohe v. Wells Fargo Bank, N.A.*, 988 F.3d 1256, 1261 n.6 (11th Cir. 2021) (citation and internal quotation marks omitted). To cure these omissions or mistakes, a court may "cause to be made *now*, an entry that [has] the same legal force and effect as if made at the time when it should have been made." *Nunc Pro Tunc*, BLACK'S LAW DICTIONARY (12th ed. 2024) (citation and internal quotation marks omitted). These entries have "retroactive legal effect," *id.*, to the extent that they "reflect the reality of what has already occurred," *Acevedo*, 140 S. Ct. at 700–01 (alteration adopted) (citation and internal quotation marks omitted).

By confusing these terms, R.C. misapplies *Acevedo*'s jurisdictional logic about removals under section 1446(d) to the bankruptcy context. The bankruptcy court, in granting the Hasmita Party's request for relief from the stay, entered an order that annulled the stay shielding the debtor's estate, not a *nunc pro tunc* order. To be sure, like the district court in *Acevedo*, the bankruptcy court issued an order that provided retroactive relief. But unlike the district court in *Acevedo*, the bankruptcy court did not "impermissibl[y]" use a *nunc pro tunc* order, designed to correct inadvertent errors, to supply jurisdiction where it never existed. Instead, it exercised its statutory power to modify the automatic stay. *Acevedo* does not apply in this context.

R.C.'s arguments, "taken to [their] logical end," would effectively nullify section 362(d). *Merriman*, 616 B.R. at 394. Every

request for relief that invokes section 362(d)—be it prospective or retrospective—is an attempt to control an asset within the bankruptcy court's exclusive jurisdiction. If that exclusive jurisdiction over a debtor's estate bars annulment of a stay, it also would bar termination or modification of the stay. Either way, section 362(d) allows the party who sought the annulment, termination, or modification to exercise control over an asset over which the bankruptcy court has jurisdiction. Adopting R.C.'s argument would strip bankruptcy courts of key powers, granted to them by Congress, to manage the bankruptcy estate. We decline to read between *Acevedo*'s lines to require this far-reaching result.

In a last-ditch effort, R.C. raises a procedural objection. He asserts that the Hasmita Party failed to comply with "the full notice and hearing requirements of the Bankruptcy Code and Rules" because it did not file a formal motion to annul the automatic stay. The text of section 362(d) states the required procedure for obtaining relief: (1) a "request of a party in interest" and (2) "notice and a hearing." The Federal Rules of Bankruptcy Procedure elaborate. Rule 4001 provides that "[a] motion under [section] 362(d) for relief from the automatic stay . . . must comply with Rule 9014." And Rule 9014, in turn, states that such motions "must be served within the time prescribed by" and "in the manner for serving a summons and complaint provided by" other rules in the Federal Rules of Bankruptcy Procedure.

Even if the bankruptcy court erred when it considered the request to annul the stay despite the Hasmita Party's failure to file

a separate motion, the error was harmless. *See* 28 U.S.C. § 2111. As the bankruptcy court observed, the Hasmita Party "made several requests" for relief, R.C. had "notice of what the [Hasmita Party]" sought, and the court "held a hearing at which [R.C.] had sufficient opportunity to oppose the requested relief." In the light of this procedural history, R.C. does not (and cannot) argue that the Hasmita Party's failure to file the separate motion required by Rules 4001 and 9014 prejudiced his rights. No procedural defect blocks our resolution of this appeal.

## IV. CONCLUSION

We **AFFIRM** the order granting relief from the stay.